IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ROBIN WARGO, | ) |
| | ) |
| Plaintiff, | ) Case No. 12 C 3197 |
| | ) |
| v. | ) Magistrate Judge Sidney I. Schenkier |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of Social Security,[1] | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**[2]

Plaintiff Robin Wargo has filed a motion seeking reversal or remand of a determination by the Commissioner of Social Security ("Commissioner") denying her Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") (doc. # 16). The Commissioner has filed a cross-motion for summary judgment seeking to affirm the denial of benefits (doc. # 24). For the reasons stated below, we grant Ms. Wargo's motion and deny the Commissioner's motion to affirm.

**I.**

We begin with the procedural history of the case. On March 10, 2006, Ms. Wargo applied for disability insurance benefits, alleging disability beginning August 18, 2005 (R. 123-31). Her application was denied initially on September 25, 2006, and upon reconsideration on January 5, 2007 (R. 80-83, 90). She requested a hearing before an administrative law judge ("ALJ"), which was granted, and held subsequently on May 5, 2009 (R. 46). On July 30, 2009,

---

[1]Pursuant to Federal Rule of Civil Procedure 25(d), we have substituted Acting Commissioner of Social Security, Carolyn W. Colvin, for Michael J. Astrue as the named defendant.

[2]On July 17, 2012, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to this Court for all proceedings, including entry of final judgment (docs. ## 7-8).

the ALJ issued a decision finding that from August 18, 2005, through the date of the decision, Ms. Wargo was not disabled under the Social Security Act ("the Act") (R. 32-43). The Appeals Council denied Ms. Wargo's request for review (R. 14-17), making the ALJ's decision the final decision of the Commissioner. *See Shauger v. Astrue*, 675 F.3d 690, 695 (7th Cir. 2012).

## II.

We next review the medical records during the relevant time period; the hearing testimony given by Ms. Wargo, her father, and the vocational expert ("VE"); and the ALJ's written decision.

### A.

Ms. Wargo was born on May 14, 1958 (R. 123). She is a high school graduate and worked in a call center for hotel reservations before she stopped working in August 2005 because of "constant pain from [her] fibromyalgia" that did not allow her to sit or stand for extended periods of time (R. 53-54). Ms. Wargo had previously worked as a supermarket clerk, a maid in a nursing home, and an assistant manager at a restaurant (R. 165-69).

### B.

Ms. Wargo was diagnosed with probable fibromyalgia on December 13, 2002, by her primary care physician, Dr. Larry Stalter, after a period of having chronic pain and tenderness in various points of her body, including the shoulders, chest, and lower back, dating back at least to May 2002 (R. 243-47). Dr. Stalter urged her to engage in low-impact exercise (*Id.*). On September 18, 2003, Ms. Wargo visited a neurologist, Dr. Rick Lasher, concerning her pain and inability to sleep (R. 211). Ms. Wargo told Dr. Lasher that she had pain in her arms and legs: her pain is at its worst when she is in bed, and though she tries to make herself more comfortable by moving around, her pain also worsens with movement (*Id.*).

2

From 2003 through 2005, Ms. Wargo continued to see Dr. Stalter regarding her fibromyalgia and other non-related illnesses, intermittently complaining of chronic pain (*see, e.g.*, R. 218-20, 236-41). At her August 6, 2004 appointment with Dr. Stalter, Ms. Wargo reported falling at work because her pain caused her knees to buckle; consequently, she reduced her work hours to 6.5 hours per day, five days per week (R. 221). On June 29, 2005, however, Dr. Stalter reported that Ms. Wargo was able to "function fairly well at work" and that she had "no new problems" (R. 229). Ms. Wargo reported that her prescription for Lorcet Plus was working well for her pain, and Dr. Stalter renewed the prescription (*Id.*).

Ms. Wargo continued to visit Dr. Stalter after her alleged onset date of August 18, 2005. Dr. Stalter consistently noted that Ms. Wargo had musculoskeletal tender points with palpation on her upper and lower back, the outside of her hips, and the inside of her knees, which were consistent with fibromyalgia trigger points (R. 338-345). Ms. Wargo told Dr. Stalter on February 24, 2006, that she had been doing "fair," but she could not work because it was too difficult for her to sit. Dr. Stalter reported that "[s]he tries to get in a little exercise but much of the time she simply does not have the where withal to do it" (R. 345). On August 21, 2006, Ms. Wargo again reported doing "fair," but "some days [we]re better than others," and she tried to walk an hour each day (*Id.*). In addition to the Lorcet, Dr. Stalter added Flexeril and Cymbalta to address her pain (*Id.*). On September 14, 2006, Ms. Wargo reported possibly less pain and better sleep at night due to the medications, and Dr. Stalter increased the Flexeril and continued the other medications (R. 329).

On September 6, 2006, Dr. Phoebe Panopio, an internist, conducted an examination of Ms. Wargo for the Bureau of Disability Determination Services ("DDS") (R. 316-19). Ms. Wargo complained of depression and "pain all over" from fibromyalgia (R. 316). The pain

varied from day to day; that day, it was in her upper back and shoulders (*Id.*). Dr. Panopio observed that Ms. Wargo could walk without any problems, was able to get on and off the examination table, and could walk on heels, on toes, and tandem walk (R. 318). Dr. Panopio also noted that Ms. Wargo had point tenderness on her upper shoulders and back (*Id.*). Ms. Wargo had 5/5 muscular strength and intact range of motion and did not have any problems with fine movements, such as writing and picking up coins (*Id.*). Dr. Panopio concluded that Ms. Wargo had fibromyalgia and depression (*Id.*).

On September 20, 2006, DDS physician Dr. Francis Vincent completed a residual functional capacity ("RFC") assessment of Ms. Wargo based on Dr. Panopio's examination (R. 320, 326). Dr. Vincent opined that Ms. Wargo could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand/walk/sit about six hours in an eight-hour workday, and had unlimited ability to push or pull (R. 321). She could climb ramps or stairs, balance, stoop, kneel, crouch, or crawl frequently, and had no manipulative or environmental limitations, but she could never climb ladders, ropes, or scaffolds (R. 322-24). Dr. Vincent also noted that the results of Dr. Panopio's examination were "essentially normal," except that Ms. Wargo alleged pain and tenderness at trigger points in both shoulders (R. 327).

On October 16, 2006, Ms. Wargo reported to Dr. Stalter that she was doing "fair": she had some chronic pain, which was exacerbated at times (R. 329). She stated that she lived with her daughter because she could not function on her own. Dr. Stalter renewed her medications and increased her dosage of Cymbalta (*Id.*). On January 5, 2007, Ms. Wargo reported she was walking regularly, which helped "control her fibromyalgia some" (R. 343). "Overall she ha[d] been doing fair," but she continued to have fibromyalgia tender points and took medication to try to control them (*Id.*). On a March 13, 2007 visit to Dr. Stalter, Ms. Wargo stated that she was

still trying to walk but that her low back pain was exacerbated in the last month (R. 343). Dr. Stalter increased the dosage of her pain medication (*Id.*).

By June 18, 2007, Ms. Wargo was living with her elderly parents and trying to help them, which put extra strain on her body (R. 342). Consequently, she reported taking extra doses of Lorcet Plus (*Id.*). On November 19, 2007, Ms. Wargo again had tenderness in her fibromyalgia points in the upper back and lower back, on the outside of the hips, and the inside of the knees. Dr. Stalter noted that she mostly has a sedentary lifestyle, but tries, sometimes unsuccessfully, to get a mild amount of exercise (R. 341). On that date, Dr. Stalter increased Ms. Wargo's dosage for Flexeril and added a Duragesic pain patch to her prescription (*Id.*).

By January 8, 2008, despite fibromyalgic tender points in the upper back, lower back, and outer hips, Ms. Wargo reported "overall feeling better" due to the Duragesic pain patch and Flexeril (R. 341). Though some days were worse than others, she wanted to maintain the same medication dosages (*Id.*). Her pain was still under relatively good control on March 25, 2008 (R. 339). On May 21, 2008, Dr. Stalter reported again that despite tenderness with palpation in her upper and lower back, outside her hips, and inside her knees, "[o]verall, she continue[d] to do relatively well on her Duragesic and Flexeril," and she continued to get out and walk (*Id.*).

On March 31, 2009 – the next entry from Dr. Stalter in the record – Dr. Stalter's report stated that Ms. Wargo's fibromyalgia was debilitating and that she had not been able to work for quite some time, even in a sedentary job, and he opined that she was "unsuitable for employment" (R. 338). Nevertheless, Dr. Stalter also reported that the use of Flexeril and a Duragesic patch "control[led] her symptoms fairly well," and she was "[a]t least . . . able to function" (*Id.*). She also continued to try to walk daily and care for her elderly parents (*Id.*).

On April 1, 2009, Dr. Stalter wrote a letter opining that Ms. Wargo could not sustain gainful employment, because even sedentary work aggravated her condition (R. 393). He stated that Ms. Wargo has suffered from fibromyalgia for several years and suffered chronic pain on a daily basis, and she required a narcotic patch to "even perform the tasks of daily living at home" (*Id.*). Further, Ms. Wargo could not sustain daily exercise and required a large amount of rest each day (*Id.*). Dr. Stalter did not expect her condition to improve in the future, and he opined that she could not tolerate work on a regular basis even though she was motivated to do so (*Id.*).

In anticipation of the hearing before the ALJ, Ms. Wargo's sister, daughter, and brother submitted letters describing Ms. Wargo's health condition. On May 1, 2009, Ms. Wargo's sister wrote that in the past ten years, her sister's health had worsened to the point where it was too painful for her to be touched (R. 203). Ms. Wargo barely went out of the house and she had chronic fatigue, so she stayed in bed most of the day (*Id.*). Ms. Wargo's health continued to worsen, and she was unable to hold her grandchildren, sew, or cook because of the pain (R. 204).

In a letter dated May 5, 2009, Ms. Wargo's daughter agreed with the statements in her aunt's letter. She stated that her mother "just kept getting worse and experiencing more pain and deteriorating mobility," to the point where she could barely move (R. 205). Ms. Wargo's brother also wrote that Ms. Wargo's condition had gotten progressively worse, to the point that she was almost bed-ridden and walking was so painful that she winced with each step (R. 206).

### C.

Ms. Wargo drove herself to the hearing on May 5, 2009 (R. 51). She testified that she is unable to work because of constant pain from her fibromyalgia, and she cannot sit for more than two hours at a time or stand for more than a half hour at a time (R. 54). Her arms and legs hurt all the time, and she has back and chest pain, as well as leg spasms (R. 58-59). In addition, due

to back surgery she had in 2001, she cannot lift more than ten pounds (R. 54-55). Ms. Wargo testified that she uses a narcotic pain patch and spends about 75 percent of her day lying down, but she has trouble sleeping due to the pain (R. 59-61).

Ms. Wargo has fair days and bad days (R. 56). She usually walks for twenty minutes each day, per Dr. Stalter's recommendations, but some days she cannot walk at all due to the pain (R. 55-56). She is able to take care of her personal hygiene, including bathing and dressing herself (R. 56). On average, she drives two to three miles per week, usually to the grocery store and back (*Id.*). Ms. Wargo testified that she currently lives with her parents in order to take care of her mother, who is ninety years old and nearly blind (R. 56-57). She does light cooking, vacuuming, and grocery shopping for her parents (R. 56-57, 62-63).

Ms. Wargo testified that she also suffers from depression, in part because of feelings of worthlessness stemming from her fibromyalgia (R. 59-60). She does not see anybody for her depression or take any medication for it (R. 63). She sees Dr. Stalter about every three months, at a hospital with a charity assistance program that pays for her medical bills (*Id.*).

Ms. Wargo's father, Richard Wargo, testified that his daughter spends most of her time in bed (R. 65). She spends about two and a half hours outside her room on an average day to play cards, do light grocery shopping, or run the vacuum cleaner (R. 64-65). Mr. Wargo also stated that she is sensitive to being touched or bumped because "she is hurting all the time" (R. 66-67). She does not go out to dinner with her parents because it is hard for her to sit that long (R. 69).

The VE testified that a hypothetical person with the same age, education, and experience as Ms. Wargo who is limited to light work, with frequent postural activities and no ropes, ladders or scaffolds, could perform all of Ms. Wargo's previous jobs, except the nursing home cleaner position, which was at the medium level (R. 71-72). If the hypothetical person was limited to

sedentary work with occasional postural activities, the VE testified that Ms. Wargo's past work as a hotel reservation clerk would be available (R. 72). The VE testified that if the hypothetical person was less than 80 percent productive, employment would not be available (*Id.*).

### D.

In a written opinion dated July 30, 2009, the ALJ found that Ms. Wargo was not disabled under the Act from August 18, 2005, through the date of the decision (R. 32). The ALJ applied the familiar five-step sequential inquiry for determining disability set forth in 20 C.F.R. § 404.1520.

At Step 1, the ALJ found that Ms. Wargo had not engaged in substantial gainful activity since her alleged onset date, August 18, 2005 (R. 38). At Step 2, the ALJ determined that Ms. Wargo's fibromyalgia was a severe impairment based on Dr. Stalter's finding that Ms. Wargo tested positive for almost all of the 18 trigger points for fibromyalgia, despite her "never [having] been treated by a . . . specialist in fibromyalgia" (*Id.*). After considering the paragraph B criteria, the ALJ determined that Ms. Wargo's medically determinable mental impairments of depression and panic disorder were not severe. At Step 3, the ALJ found that Ms. Wargo's impairment or combination of impairments do not meet or medically equal a listed impairment (R. 39).

The ALJ determined that Ms. Wargo has the RFC "to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except she can never climb ropes, ladders or scaffolds and she is limited to occasional climbing of ramps or stairs, balancing, stooping, kneeling crouching, or crawling" (R. 39). In concluding that Ms. Wargo had the capacity to perform sedentary work, the ALJ found that the medical record and Ms. Wargo's testimony did not support her subjective complaints of incapacity due to constant pain (R. 40). The ALJ noted that Ms. Wargo did not know where the tender fibromyalgia points on her body were (*Id.*). In

addition, Ms. Wargo testified that she spends 75 percent of her time in bed, but the ALJ found this "inconsistent" with her doctor's recommendation that she exercise regularly and with her complaint to Dr. Lasher that her pain is worse when she is in bed (R. 40-41). The ALJ also observed that Ms. Wargo acknowledged that her pain medication, specifically a Duragesic patch, was effective and kept her pain "under relatively good control" (R. 40).

Regarding Ms. Wargo's daily activities, the ALJ noted Ms. Wargo's testimony that she can take care of her own personal hygiene and do light cooking, vacuuming, and grocery shopping (R. 41). The ALJ then pointed out that because her father works outside of the home and her mother is nearly blind, Ms. Wargo is most likely caring for her during the day (*Id.*).

The ALJ placed "little weight" on Dr. Stalter's April 1, 2009 opinion as to Ms. Wargo's RFC, in which Dr. Stalter stated that due to her condition, Ms. Wargo could not, and would not in the future, be able to sustain regular employment (R. 41). *First*, the ALJ reasoned that Dr. Stalter's opinion "appear[ed] to be greatly influenced by the claimant's subjective complaints," and did not support his statement that Ms. Wargo could not perform sedentary work with any objective medical evidence (*Id.*). *Second*, the ALJ found that the Commissioner, not Dr. Stalter, is the one qualified to determine Ms. Wargo's employability (*Id.*). *Third*, the ALJ noted that Dr. Stalter was not a rheumatologist or specialist in any related field (*Id.*).

The ALJ placed "more weight" on the opinions of the agency medical consultants, Drs. Vincent and Panopio (R. 41-42). The ALJ reasoned that Dr. Vincent's opinion that Ms. Wargo could perform light work was supported by objective medical evidence, including Dr. Panopio's examination, at which he observed that Ms. Wargo could walk "without problems" and "get on and off the exam table" (R. 42).

The ALJ then considered the three letters from members of Ms. Wargo's family that described her limitations from her pain (R. 42). In light of these letters and Ms. Wargo's subjective claims, the ALJ assigned a more restrictive RFC than that recommended by Dr. Vincent: one that limited Ms. Wargo to sedentary rather than light work (*Id.*).

At Step 4, the ALJ relied on the VE's testimony in finding that under the assigned sedentary RFC, Ms. Wargo was capable of performing her past work as a reservation clerk, as actually and generally performed (R. 42). Consequently, the ALJ concluded that Ms. Wargo was not disabled, as defined by the Act, from August 15, 2005 through the date of the decision (*Id.*).

### III.

Initially, Ms. Wargo contends that the Appeals Council improperly denied her request for review by not considering additional evidence from rheumatologist Dr. Genene Radden that Ms. Wargo obtained and submitted after the ALJ's ruling (doc. # 17: Pl.'s Mem. at 5-8). Dr. Radden examined Ms. Wargo on August 19, 2009, and found "diffuse tender points to very light touch involving her entire paraspinal muscles, upper chest, arms and legs above and below her knee joints," suggestive of fibromyalgia (R. 395). On October 29, 2009, Dr. Radden completed an RFC assessment, opining that Ms. Wargo could frequently lift and/or carry a maximum of ten pounds; could stand, walk, and sit a total of less than six hours; and was limited in her ability to push or pull because of her fear of triggering pain (R. 401). Ms. Wargo could never climb, kneel, crouch, or crawl and only occasionally balance and stoop, and she had limited ability to reach, handle, or finger things (R. 401-02).

Ms. Wargo submitted Dr. Radden's reports to the Appeals Council, along with her request for review of the ALJ's decision (R. 25-26). On January 14, 2011, the Appeals Council denied Ms. Wargo's request for review, stating that "[w]e have found no reason under our rules

to review the Administrative Law Judge's decision." Specifically, the Appeals Council stated that: "[i]n looking at your case, we considered the reasons you disagree with the decision and the additional evidence listed on the enclosed Order of Appeals Council. . . . We found that this information does not provide a basis for changing the Administrative Law Judge's decision" (R. 14-15).[3] The Seventh Circuit has interpreted this language to mean that the Council "rejected [the] new evidence as non-qualifying" for review under the regulations. *Farrell v. Astrue*, 692 F.3d 767, 771 (7th Cir. 2012).[4] *See* 20 C.F.R. § 404.970(b).

The Court may order a remand for additional evidence to be taken upon a showing that it is "new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." *Schmidt v. Barnhart*, 395 F.3d 737, 741-42 (7th Cir. 2005) (quoting 42 U.S.C. § 405(g)). The Commissioner argues that Ms. Wargo "has not, and cannot, establish good cause for failing to raise the additional evidence at or before the administrative hearing" (doc. # 24: Def.'s Mem. at 8). To meet the requirement of good cause, a claimant must "demonstrate sufficient reason for failing to incorporate the evidence into the record during the administrative proceeding." *Sample v. Shalala*, 999 F.2d 1138, 1144 (7th Cir. 1993).

Plaintiff's memorandum did not address whether she had good cause to submit the additional evidence after the ALJ's opinion, and Ms. Wargo failed to file a reply to address the Commissioner's arguments. As such, Ms. Wargo offers no reason, much less "sufficient

---

[3]The Appeals Council listed the additional evidence as "treatment notes from Dr. Stalter dated August 19, 2009" (R. 17). Both parties presume -- and we agree -- that the additional evidence before the Appeals Council was Dr. Radden's August 19, 2009 examination and report, as well as her October 2009 RFC findings.

[4]The Commissioner's argument that we should instead interpret the Appeals Council's language to mean that the Council actually considered the additional evidence before rejecting Ms. Wargo's appeal (doc. # 25: Def.'s Mot. at 5) is a non-starter. In *Farrell*, the Seventh Circuit conclusively interpreted the language used by the Appeals Council there -- the same language the Appeals Council used here -- as rejecting the additional evidence for failure to meet the new and material requirement of the regulations.

reason," for not visiting a rheumatologist until after the ALJ issued his opinion, despite having complained about fibromyalgia since 2002. This leads us to suspect "that when [she] was unsuccessful in the agency and district court hearings, [s]he sought out new expert witnesses who might better support h[er] disability claim." *Allen v. Sec'y of HHS*, 726 F.2d 1470, 1473 (9th Cir. 1984). This does not constitute good cause for failing to obtain and offer evidence into the record earlier. *See Anderson v. Bowen*, 868 F.2d 921, 928 (7th Cir. 1989) (no good cause for submitting psychological assessments after administrative proceedings where claimant's attorney discovered new avenue of proof only after client's applications were denied); *Mowery v. Apfel*, No. 99 C 2974, 2000 WL 12828, at *3 (7th Cir. Jan. 3, 2000) (no good cause for submitting mental evaluation after the ALJ's opinion because claimant could have sought and presented such evidence earlier); *Perkins v. Chater*, 107 F.3d 1290, 1296 (7th Cir. 1997) (no good cause for failing to seek out a doctor's evaluations earlier); *see also Jirau v. Astrue*, 715 F. Supp. 2d 814, 825 (N.D. Ill. 2010) (no good cause for failing to seek out and submit expert reports earlier).[5] Consequently, the Appeals Council's decision not to consider the additional evidence proffered by Ms. Wargo fails to support the argument for remand.

## IV.

Nevertheless, remand is warranted because of deficiencies in the ALJ's credibility determination. We uphold an ALJ's opinion if it is supported by substantial evidence, which is evidence a reasonable person would find adequate to support the decision. *Terry v. Astrue*, 580

---

[5] By contrast, in cases where courts have found that the claimant established good cause, the claimant had demonstrated reasons, financial or otherwise, for the delay in submitting evidence. *See, e.g., Fieldhouse v. Astrue*, No. 09 C 6358, 2012 WL 426702 at *10 (N.D. Ill. Feb. 8, 2012) (finding good cause where plaintiff could not afford MRI exam prior to ALJ hearing); *Bush v. Astrue*, 571 F. Supp. 2d 866, 876-77 (N.D. Ill. 2008) (finding good cause given the "unique circumstances" of the case, where plaintiff was unable to obtain test results prior to ALJ hearing for financial reasons); *Sears v. Bowen*, 840 F.2d 394, 399-400 (7th Cir. 1988) (finding good cause due to a combination of factors, including plaintiff's psychiatric history, vision problems and reliance on others to read and explain notices to him, and fact that he was represented by lay advocates "whose endeavors obviously left much to be desired"). There is no evidence that any of these factors were at play here.

F.3d 471, 475 (7th Cir. 2009). "We will not . . . reweigh the evidence or substitute our judgment for that of the ALJ's." *Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013). "The ALJ is not required to address every piece of evidence or testimony presented, but must provide an accurate and logical bridge between the evidence and her conclusion that a claimant is not disabled." *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012) (internal quotations omitted).

Ms. Wargo contends that the ALJ erred by relying on the oft-maligned boilerplate statement: "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment" (Pl.'s Mem. at 12; R. 40). While "ALJs who employ this objectionable boilerplate can salvage their credibility findings by providing sufficient additional analysis of the claimant's credibility," the credibility determination "must be justified with specific reasons and have support in the record." *Hamilton v. Colvin*, No. 12 C 3085, 2013 WL 1855725, at *4-5 (7th Cir. May 3, 2013). These reasons may "include[e] the claimant's daily activities, her level of pain or symptoms, aggravating factors, medication, treatment, and limitations." *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009) (citing 20 C.F.R. § 404.1529(c); S.S.R. 96-7p).

The Commissioner argues that the ALJ properly supported his credibility finding (Def.'s Mem. at 19-20). As stated above, the ALJ explained that he found the claimant's testimony that she lies in bed most of the day and is unable to work due to constant pain inconsistent with: (1) her testimony and Dr. Stalter's reports that her medication keeps her pain "under relatively good control;" (2) her testimony that she had 14 positive points for fibromyalgia but did not know where these trigger points were located; (3) Dr. Stalter's recommendations that she exercise; and (4) her activities of daily living (R. 40-41).

Case: 1:12-cv-03197 Document #: 28 Filed: 07/26/13 Page 14 of 18 PageID #:539

We agree that the ALJ went part of the way in attempting to move beyond the mere incantation of boilerplate language; he did offer specific reasons for his credibility determination. However, as we explain below, those stated reasons for the credibility determination fall short.

*First*, the ALJ's decision to rely on Ms. Wargo's and Dr. Stalter's reports that her medications were effective contrasts sharply with the ALJ's decision to give "little weight" to Dr. Stalter's opinions – and little credence to Ms. Wargo's testimony – as to the effect of the pain on Ms. Wargo's ability to function. The ALJ does not explain why he deemed Dr. Stalter's opinions and Ms. Wargo's testimony reliable only as to the effectiveness of medication in controlling Ms. Wargo's pain, but not otherwise. Moreover, "[a]n ALJ may not selectively consider medical reports" or "address mere portions of a doctor's report." *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009). Dr. Stalter's notes over the years indicating that Ms. Wargo's pain medications were "working well," "relatively good," or "fair," coincide with Ms. Wargo testing positive for fibromyalgia trigger points and her needing increased doses of strong pain medication, including Lorcet Plus, Flexeril, Cymbalta, and a Duragesic pain patch. The ALJ ignored these relevant portions of Dr. Stalter's reports and thus failed to build a logical bridge between the evidence and his conclusion that Ms. Wargo's testimony was not credible. *See Shauger v. Astrue*, 675 F.3d 690, 697-98 (7th Cir. 2012).

*Second*, the ALJ did not explain why the claimant's lack of understanding as to the location of her fibromyalgia trigger points detracts from – rather than supports – the credibility of her testimony as to her level of pain. The Seventh Circuit has stated that as to pain from fibromyalgia trigger points, "[a]ll these symptoms are easy to fake, although few applicants for disability benefits may yet be aware of the specific locations that if palpated will cause the patient who really has fibromyalgia to flinch." *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir.

14

1996). Ms. Wargo's uncertainty as to the actual trigger point locations – despite Dr. Stalter repeatedly noting over the years that she had pain at these points – suggests that she would not know enough to fake pain at those locations even if she were so inclined. And, the ALJ did not find that Ms. Wargo was untruthful in saying that she did not know where the trigger points are located.

*Third*, the ALJ erred in finding that Dr. Stalter's recommendation of daily exercise was inconsistent with Ms. Wargo's testimony that she spends most of the day in bed. In his reports, Dr. Stalter noted several times that Ms. Wargo had difficulty completing the prescribed exercise. In February 2006, despite "discussing at length the importance for the claimant to have regular exercise," as the ALJ noted (R. 40), Dr. Stalter reported that "much of the time [Ms. Wargo] simply does not have the where withal to" exercise (R. 345). Similarly, on November 19, 2007, Dr. Stalter reported that Ms. Wargo "mostly ha[d] a sedentary lifestyle," and that "[s]he tries to get some mild amount of exercise but has not always been successful" (R. 341). In his April 1, 2009 report, Dr. Stalter stated that Ms. Wargo could not sustain daily exercise and required a large amount of rest each day (R. 393). Furthermore, except for an August 2006 note indicating that she tried to walk an hour each day, when Ms. Wargo was able to walk, she could only walk for about 20 minutes at a time. Walking 20 minutes at a time, even each day, does not contradict Ms. Wargo's testimony that she spends most of her day in bed.

*Fourth*, the ALJ failed to explain why Ms. Wargo's testimony as to her pain and functional limitations was inconsistent with her activities of daily living. The Seventh Circuit has "repeatedly cautioned that a person's ability to perform daily activities, especially if that can be done only with significant limitations, does not necessarily translate into an ability to work full-time." *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013). Unlike full-time work, activities

15

of daily living can be flexibly scheduled and are not held to a minimum standard of performance. *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012). It is against the backdrop of these admonitions that we consider the ALJ's discussion of Ms. Wargo's activities of daily living.

The ALJ noted that Ms. Wargo acknowledged that she can take care of her own personal hygiene, including bathing and dressing (R. 41). In addition, she does light cooking for her parents and some vacuuming and grocery shopping, though her father helps her carry in the groceries because the heaviest she can lift is a gallon of milk (*Id.*). Without more, these activities do not undermine Ms. Wargo's claim of pain that disables her from performing full-time work. In *Hughes v. Astrue*, 705 F.3d 276, 278 (7th Cir. 2013), for example, the Seventh Circuit held that the ALJ erred in attaching great weight to the claimant's ability to do laundry, cook, and shop for groceries because the claimant had no other choice but to do so, "painful though that may be." *See also Bjornson*, 671 F.3d at 647 ("one can have awful headaches yet still dress and bathe"). The "ability to struggle through the activities of daily living does not mean that she can manage the requirements of a modern workplace." *Punzio v. Astrue*, 630 F.3d 704, 712 (7th Cir. 2011).

The ALJ also pointed to Ms. Wargo's activities in caring for her mother. While Ms. Wargo's father testified that his daughter usually lies in bed most of the day and does little around the house, the ALJ deduced from the record that because Ms. Wargo's father works outside of the home and her mother is nearly blind, Ms. Wargo is most likely taking care of her mother during the day (R. 41). Again, the ALJ failed to explain why spending time caring for her mother indicates that Ms. Wargo could perform full-time work. "[T]he activities the ALJ characterizes as inconsistent with [Ms. Wargo's] limitations do not necessarily involve sitting [or standing] for longer than 20 minutes" at a time. *Hamilton*, 2013 WL 1855725, at *5. The ALJ

failed to point to evidence that caring for her mother, who is legally blind and ninety years old, would require Ms. Wargo to be out of bed most of the day. At home, unlike at work, Ms. Wargo would have the flexibility to lie down after completing an activity of daily living. And, the ALJ failed to address the point that both Ms. Wargo and Dr. Stalter stated that helping her mother put extra strain on Ms. Wargo (*see, e.g.*, R. 342). As the Seventh Circuit explained in *Roddy*, a claimant's "inability to get through the day without lying down three to four times for an hour . . . does not indicate an ability to work even a sedentary job full-time." *Roddy*, 705 F.3d at 639. "[O]ne does sedentary work sitting . . . but not lying down." *Bjornson*, 671 F.3d at 648.

In addition, we note a tension between the ALJ's credibility finding and his treatment of letters from Ms. Wargo's daughter and siblings that described her limitations as disabling. Ms. Wargo's sister stated that Ms. Wargo "barely went out of the house" and "stayed in bed most of the day" (R. 203), which was consistent with the hearing testimony of Ms. Wargo's father. Ms. Wargo's daughter stated that her mother "could barely move" (R. 205). The ALJ said that in light of these letters and Ms. Wargo's own subjective testimony, he assigned to Ms. Wargo a sedentary RFC that was more restrictive than the light work RFC recommended by the agency examiner (R. 42).

What is left unexplained is why the letters from Ms. Wargo's family members were sufficiently credible to persuade the ALJ to adopt an RFC more restrictive than that recommended by the agency examiner, but not sufficiently credible to support the testimony offered by Ms. Wargo and her father (not to mention from Dr. Stalter) that she has disabling limitations. Perhaps there was a perfectly good reason for the ALJ to limit the impact of the statements by family members in the way that he did. But, if so, it was incumbent upon him to

articulate that reason; we are not at liberty to guess at the reason, or to fill in a reason when the ALJ failed to provide one.[6]

## CONCLUSION

Based on the foregoing, plaintiff's motion for reversal and remand is granted (doc. # 16), and the Commissioner's motion for summary judgment (doc. # 24) is denied. As a result of our ruling on the grounds above, we do not address the remaining arguments made by plaintiff.

ENTER:

SIDNEY I. SCHENKIER
United States Magistrate Judge

Dated: July 26, 2013

---

[6] The ALJ's use of the family member letters as a basis for giving Ms. Wargo an RFC for sedentary work raises a separate issue that the parties did not explore in the briefing, but that the ALJ must consider on remand. There was no medical opinion that Ms. Wargo's limitations should lead to an RFC for sedentary work: the agency opinion was that she should have a less restrictive RFC (for light work), and Dr. Stalter's opinion was that she was precluded from any work. "ALJs are not permitted to construct a middle ground RFC without a proper medical basis." *Brown v. Astrue*, No. 12 C 1750, 2012 WL 6692139, at *13 (N.D. Ill. Dec. 19, 2012) (quoting *Norris v. Astrue*, 776 F. Supp. 2d 616, 637 (N.D. Ill. 2011)). *See also Paar v. Astrue*, No. 09 C 5169, 2012 WL 123596, at *13 (N.D. Ill. Jan. 17, 2012) (citing *Bailey v. Barnhart*, 473 F. Supp. 2d 822, 839 (N.D. Ill. 2006)) ("Instead of basing the RFC on medical evidence, it is clear that the ALJ created his own RFC based on his assumptions of what [the claimant] could do. Courts have consistently found such an unsupported finding concerning the RFC to be an improper act of 'playing doctor'"). Here, the ALJ failed to explain the basis in the medical evidence for adopting an RFC for sedentary work. To the contrary, all that he cited were the lay opinions of Ms. Wargo's family members and Ms. Wargo's own subjective complaints. On remand, if the ALJ chooses to adopt an RFC other than one suggested by a medical opinion, he must do more to explain the "proper medical basis" for that RFC.

18